UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY AND AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,<br><br>Plaintiffs,<br><br>v.<br><br>C.D. STIMSON CO.,<br><br>Defendant. | Case No. C17-235 RSM<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on cross-motions for summary judgment filed by Plaintiffs Continental Casualty Company and American Casualty Company of Reading, Pennsylvania (collectively referred to herein as "CNA"), and by Defendant C.D. Stimson Company ("Stimson"). Dkts. #18 and #22. CNA moves for an order declaring it does not owe Stimson a duty to defend for conditions being placed on its permit to redevelop its commercial property. Stimson moves only for summary judgment on the issue of CNA's duty to indemnify Stimson. For the reasons stated below, the Court GRANTS CNA's Motion and DENIES Stimson's Motion.

//

//

## I. BACKGROUND

Defendant Stimson has operated in Seattle since roughly 1888. Dkt. #24 ("Bayley Decl."), ¶ 2. Among other businesses, it operated a lumber mill on the shore of Salmon Bay in the Ballard neighborhood north of downtown Seattle from 1888 until 1955. *Id.*; *see also* Dkt #25 ("Stumpf Decl."), Ex. 3 at 08732.[1] The mill property is approximately 11.08 acres in size and is located on Shilshole Avenue Northwest in Seattle (the "Property"). Stumpf Decl. Ex. 3 at 08737.

Before 1955, a portion of the mill was built on pilings extending over the water and tidelands of Salmon Bay. *Id.* at 08732. Byproducts of mill operations, primarily wood debris and sawdust, were deposited on the Property and adjacent tidelands. *Id.*

Stimson closed the mill in 1955, and the mill's buildings were demolished in 1957 and 1958. *Id.* A bulkhead was constructed in 1959 and the site was filled. *Id.* The fill material included sawdust from the mill's activities and approximately 800,000 cubic yards of fill from the Interstate 5 highway construction project. *Id.* Between 1959 and 1979, Stimson built four warehouse and office buildings and a 250-slip marina on the Property. *Id.* at 08737, 08738. Stimson leases the office space, the warehouse space, and the slips in the marina to various tenants. Bayley Decl. ¶ 2.

### A. Soil Contamination and Proposed Cleanup

The parties agree that the soil in the Property is contaminated. Soil samples collected from the Property contained diesel- and oil-range petroleum hydrocarbon ("DRPH" and "ORPH," respectively) concentrations that exceed the Model Toxics Control Act ("MTCA") Method A cleanup levels of 2,000 milligrams per kilogram (mg/kg). The highest concentration

---

[1] The Court will adopt the parties' citation method referring to exhibit numbers and Bates stamp numbers. "08732" refers to the Bates stamp "Stimson08732," located at Dkt. #25-1, page 33.

of ORPH was 74,000 mg/kg collected at a depth of 20 feet below ground surface, a concentration so high that an oil sheen could be seen with the naked eye. Stumpf Decl. ¶ 8, Ex. 6 at 03022. The highest concentration of DRPH was 29,000 mg/kg, also collected at a depth of 20 feet. *Id.* ¶ 8, Ex. 6 at 03022. Samples of groundwater collected from the same location were contaminated with ORPH at a concentration of 1,800 micrograms per liter (μg/L), which exceeds the MTCA Method A cleanup level in groundwater of 500 μg/L. *Id.* ¶ 8, Ex. 6 at 03022.

Additionally, the sawdust and wood debris are decomposing and causing the emission of methane gas at concentrations exceeding permissible MTCA levels. *Id.* Ex. 3 at 08745, 08748. Under MTCA, any concentration of methane over 0.5% exceeds the Method B and Method C air cleanup levels. *See id.* ¶¶ 11, 14. Testing has revealed concentrations of methane at 0.44% to 64% beneath the Property. ¶ 11.

Stimson admits that its activities on the Property before 1960 caused the above contamination. *See* Stumpf Decl. Ex. 3 at 08748. The methane build up is predictable from the presence of the sawdust and wood debris, and petroleum hydrocarbon pollution can be explained by oil used for mill operations. The contaminated soil is located very near the former saw mill, where saws and machinery were frequently oiled, and the depth of the contaminated soil was 20 feet below ground surface, beneath fill deposited on the Property. *Id.* Ex. 6 at 03023. The soil above was not contaminated. *See id.* Ex. 6 at 03021-22.

In January 2008, Stimson applied to the City of Seattle ("City") to subdivide the Property. Dkt. #23 ("Wu Decl.") Ex. 1. The City approved Stimson's application, and subdivided the property into eight parcels: Parcels R, S, T, V, W, X, Y, and Z. *Id.*

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 3

The parcel furthest to the north—Parcel R—is currently used as a parking lot and was a starting point for Stimson's redevelopment plans. Stimson has referred to this property as the "Salmon Bay Center." Beatty Decl., Ex. 1 at 4. The first step in redeveloping Parcel R was to submit the application for the Master Use Permit ("MUP"). The Seattle Land Use Code, Title 23 of Seattle Municipal Code (the "Code"), requires issuance of a MUP for any proposed development that requires a State Environmental Policy Act ("SEPA", Chapter 43.21C RCW) threshold determination. SMC 23.76.006(B)(6), (C). Stimson's proposed redevelopment of Parcel R is subject to environmental review under SEPA, and thus required a MUP. Stimson applied for a MUP for Parcel R in September 2009, shortly after the City approved the subdivision. Wu Decl. Ex. 7.

When the City processes an MUP application, the application is circulated for review by all departments that have jurisdiction over an element of the proposal. *See* Wu Decl. Ex. 17. If the departmental review of the MUP application identifies any corrections necessary to comply with the Code, the City issues a "correction notice" to the applicant. *Id*. A correction notice may also require the applicant to submit additional information so that the City may make a determination of code compliance. *Id*.; see also SMC 23.76.010(E)(2), (F). Once the City issues a correction notice, the applicant must respond in order for the City to continue processing the application. *See* SMC 23.76.005(A); *see also* SMC 23.76.010(F).

For the Parcel R MUP application, the City issued a correction notice dated December 9, 2009 ("Correction Notice"), which instructed Stimson to respond. Wu Decl. Ex. 2 at 13172. The Correction Notice identified several conditions that Stimson was required to address for the City to continue processing the application, including several environmental conditions. *See* Wu Decl. Ex. 2. Stimson was required to participate in a Voluntary Clean-up Program

("VCP"). Stimson and the City went back and forth. *See* Dkt. #22 at 7–8. The City eventually granted the application and issued the MUP on February 7, 2013. Wu Decl. Ex. 7 at 24852.

After pausing during the recession, Stimson resumed redevelopment of the Property in February 2016. Stimson submitted its application to the Washington Department of Ecology ("WDOE" or "Ecology") to re-enroll in the VCP on February 5, 2016. Stumpf Decl. Ex. 2. As part of enrollment in the VCP and as a condition to issuance of a No Further Action ("NFA") letter, Ecology required Stimson to (1) investigate and characterize the scope of contamination, (2) prepare a Remedial Investigation and Feasibility Study, (3) prepare the Cleanup Action Plan, and (4) request an opinion from Ecology. *See id.* Exs. 2-4; Wu Decl. Ex. 15. With its application, Stimson submitted the Remedial Investigation and Feasibility Study dated February 4, 2016. Stumpf Decl. Exs. 2, 3. Stimson later submitted its Cleanup Action Plan dated August 26, 2016. *Id.* Ex. 4. Ecology accepted Stimson's application for entry into the VCP on January 20, 2017, and issued an opinion letter dated January 3, 2018. Bayley Decl. Ex. 2; Stumpf Decl. Ex. 5.

**B. Insurance Coverage**

Between 1969 and 1979, Stimson purchased primary comprehensive general liability policies from CNA ("Primary Policies"). *See* Bayley Decl. ¶ 5, Exs. 3-7. The Primary Policies require CNA to defend Stimson against "suits" and to pay all sums Stimson is "legally obligated to pay as damages." *E.g.*, *id.*, Ex. 4. Stimson also purchased umbrella excess liability policies from CNA containing similar indemnification language ("Umbrella Policies," and together with the Primary Policies, "Policies"). *See id.*, Exs. 8–13. The Umbrella Policies cover (1) liabilities covered by the primary policies but exceeding their limits and (2) liabilities not covered by the primary policies but exceeding retained limits. *Id.*

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 5

On December 24, 2015, Stimson provided notice to CNA of its potential claims under the Policies for damages, defense, and indemnity related to environmental contamination and cleanup costs at the Property. Wu Decl. Ex. 8. The letter asserted "Stimson faces significant liability related to soil, ground water, and methane gas contamination identified at the Property, including investigation and cleanup and other related losses because of coercive requirements mandated by the City of Seattle (the "City") and the Washington Department of Ecology ("Ecology")." *Id.* The letter went on:

> As a condition of entitlements for redevelopment of Parcel R, Stimson is required by the City of Seattle to investigate the contamination, clean up the Property, and implement certain mitigation measures to address the methane gas. Specifically, the City conditioned the Master Use Permit for the Parcel R redevelopment on the creation of a Methane Mitigation Plan and participation in Ecology's Voluntary Cleanup Program. . . . The City and Ecology's requirements are coercive and require Stimson to investigate and clean up the Property in compliance with MTCA.

*Id.*

CNA initially accepted the claim under a reservation of rights by letter dated May 16, 2016. *Id*. Ex. 9. CNA paid a portion of the expenses that Stimson submitted for reimbursement. Beatty Decl., Ex. 56.

On September 1, 2016, Stimson tendered $363,671.47 in environmental expenses to CNA. Wu Decl., Ex. 10. These expenses consisted of environmental consultant fees and attorneys' fees incurred to investigate the scope and extent of contamination and to prepare the cleanup action plan. *See id*. Stimson has since incurred at least $68,158.40 in additional expenses to further investigate its liabilities under MTCA. *Id*. at ¶ 15. Of Stimson's expenses, CNA paid only $41,218.89 by letter dated December 13, 2016. *Id*., Ex. 11. CNA rejected the remainder of the expenses tendered by Stimson. *See id*.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 6

## C. This Lawsuit

After Stimson refused CNA's demand to withdraw the remainder of its claim (*see* Wu Decl., Ex. 12), CNA filed this action against Stimson for declaratory relief on the duty to defend. Dkt. #1 and #4. Stimson counterclaimed for declaratory relief, breach of contract, bad faith, violation of the Insurance Fair Conduct Act, and violation of the Consumer Protection Act. Dkt. #13. Only the claims for declaratory relief are now before the Court. In response to CNA's lawsuit, Stimson conducted further investigation of its environmental liabilities. Stimson's expert prepared a report dated September 1, 2017, detailing her findings that contaminated soil from the Property was contaminating groundwater in excess of levels permissible under MTCA. *See* Stumpf Decl. Ex. 6.

## II. DISCUSSION

## A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable

inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B. CNA's Motion**

The interpretation of insurance policies is a question of law. *Weyerhaeuser Co. v. Aetna Casualty & Sur. Co.*, 123 Wn.2d 891, 897, 874 P.2d 142 (1994). The language of the policy is to be interpreted in accordance with the way it would be understood by the average person, rather than in a technical sense. *Id.* An ambiguity exists in an insurance contract if the language is fairly susceptible to two different reasonable interpretations. *Id.* When the parties' language is ambiguous, courts attempt to enforce the parties intent. *Greer v. Nw. Nat'l Ins. Co.*, 109 Wn.2d 191, 200, 743 P.2d 1244 (1987).

Washington law imposes on insurers a broad duty to defend their insureds. *See, e.g., Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn. 2d 55, 64, 1 P.3d 1167 (2000).

CNA frames the issues in its Motion as:

> 1. Where an insured under a general liability insurance policy applies for land use and building permits for commercial property development, and as a condition for issuance of permits is informed that (1) it must enroll in the Washington Department of Ecology's Voluntary Cleanup Program, and (2) it must prepare a methane mitigation plan to avoid asphyxiation and explosion risks in the proposed commercial building, is the permit condition the functional equivalent of a lawsuit requiring liability insurers to provide a "defense"?
>
> 2. Where the Washington Department of Ecology issues an advisory opinion letter establishing conditions for issuing a "No Further Action" letter for a property enrolled in the WDOE's Voluntary Cleanup Program, and a party participating in the Voluntary Cleanup Program may unilaterally withdraw from the

> program at any time, are the conditions the functional equivalent of
> a lawsuit requiring liability insurers to provide a "defense"?

Dkt. #18 at 15. The Court generally agrees with this framing of the facts and legal issues.

The policies at issue in this case provide that CNA "shall have the right and duty to defend suit against the insured seeking damages." *See e.g.*, Bayley Decl Ex. 4. The term "suit" is not defined.

CNA argues that the duty to defend is not triggered until a "suit" has been filed against the insured, and that no such suit has occurred here. Dkt. #18 at 17. The term "suit," when not specifically defined in an insurance policy, has been held to be ambiguous in the environmental liability context as to the type of third party action that triggers the duty to defend. *Id.* (citing *Gull Industries, Inc. v. State Farm Fire & Casualty Co.*, 181 Wn. App. 463, 477, 326 P.3d 782 (2014).)

Both parties cite to *Gull* for the Court's consideration. *See* Dkt. #22 at 12. In *Gull*, the insured undertook voluntary remediation of contaminated soil and groundwater at a gas station and notified the WDOE of its cleanup. The WDOE sent an acknowledgement letter but did not threaten any enforcement action. In a subsequent insurance coverage action, the court held that the word "suit" does not require a formal complaint filed in court and may include "administrative enforcement acts that are the functional equivalent of a suit." *Id*. This holding is relied on by Stimson. However, the court also held that an acknowledgement letter from the WDOE was not sufficiently coercive to trigger a duty to defend because the letter "did not present an express or implied threat of immediate and severe consequences." *Id*. at 478.

Here, Stimson has not undertaken voluntary remediation of contaminated soil and then notified the WDOE, as was the case in *Gull*. However, it can be said that Stimson is voluntarily developing its property and encountering administrative obstacles to that development. If

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 9

Stimson decides the costs of redevelopment are too high, it may be able to simply scrap its plans without facing any further liability. The communications from the WDOE prior to this lawsuit do not present an express or implied threat of immediate and severe consequences if Stimson simply maintains the status quo.[2] Stimson is not legally in a defensive position, yet.

The Court agrees with CNA that the January 3, 2018, "advisory opinion" from the WDOE also does not *compel* cleanup action. *See* Beatty Decl. Ex. 50 at 1. While the letter lists measures that must be taken before the WDOE would issue an NFA letter, the letter does not threaten any other consequences if Stimson does not take such measures; the only consequence would be that Stimson might not receive a NFA letter, which would simply maintain the status quo.

The Court agrees with CNA that the WDOE's advisory role in this VCP stands in stark contrast to the enforcement methods the agency could use under MTCA to compel cleanup of hazardous materials. The WDOE is empowered to issue orders requiring site cleanup. RCW 70.105D.050(1).

Given all of the above, the Court concludes that CNA's duty to defend has not yet been triggered and grants summary judgment for CNA on its declaratory judgment claim.

**C. Stimson's Motion**

An insurer's duty to defend and its duty to indemnify are different obligations, analyzed separately. *Weyerhaeuser*, 123 Wn.2d at 902. Stimson argues that "[w]hether an agency has

---

[2] As CNA notes, "[i]n its VCP acceptance letter to Stimson, the WDOE does not tell Stimson that it is required to do anything, other than inform Stimson of data submittal procedures and request that technical data, if any, be provided by an appropriately licensed professional." Dkt. #18 at 20 (citing Beatty Decl., Ex. 48). The letter notes that Stimson had requested a written opinion on the sufficiency of its cleanup, and that the WDOE would review material submitted by Stimson and provide such an opinion. Beatty Decl. Ex. 48 at 2. The VCP Agreement entered between Stimson and the WDOE also lacks explicitly compulsory language. *See* Beatty Decl. Ex. 49. The Agreement states that its purpose "is to facilitate independent remedial action at the Site." *Id*. The WDOE agreed to provide site-specific technical consultations, which could include assistance in identifying applicable regulatory requirements and opinions on whether particular remedial actions met those requirements. *Id*. The Agreement further provides that opinions provided by the WDOE under the Agreement would be "advisory only." *Id*. The Agreement may be unilaterally terminated by either party without cause. *Id*.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 10

been 'coercive or adversarial' is irrelevant in determining whether a duty to indemnify exists, and that "[t]he only relevant analysis is whether the insured was or is 'legally obligated' to pay the expenses at issue." Dkt. #22 at 20 (citing *Weyerhaeuser*, 123 Wn.2d at 901-02). Stimson argues that its liability under MTCA is indisputable. It is true that MTCA imposes strict, joint, and several liability on, among others, the owner of a contaminated property, the owner of a contaminated property at the time of a release of a hazardous substance, and any person who arranges for disposal of a hazardous substance on a property. RCW 70.105D.040(1)(a)-(c). These "potentially liable persons" ("PLP") may assert only a few, very narrow, defenses to MTCA liability. See RCW 70.105D.040(3); .020(26). Stimson argues that, due to its long-time ownership and control of the Property and the former mill, it indisputably meets the statutory definition of "potentially liable party" and no MTCA defenses apply. *See* RCW 70.105D.020(26); 70.105D.040(3). The Policies require CNA to indemnify Stimson for "all sums which the insured shall become legally obligated to pay as damages. . . ." *See*, *e.g.*, Bayley Decl. Ex. 4.

In Response, CNA argues that "the entirety of the costs for which Stimson has requested reimbursement consists of costs that would be categorized [under the applicable WAC] as "defense" if there were anything to defend…. Stimson's costs at this point are voluntary business expenditures incurred for the purpose of developing its property." Dkt. #27 at 5. CNA cites to WAC 284-30-390(3), which refers to payments an insurer would make, under its duty to defend, for "costs reasonably incurred in an investigation to determine the source of contamination, the type of contamination, and the extent of the contamination." CNA argues that *Weyerhaeuser* is factually distinct from this case, because the cleanup costs here are not inevitable, because Stimson is not working in concert with the WDOE, and because there are

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 11

fewer public health concerns than were present in that case. *See id.* at 6–7. CNA argues that the Property is relatively stable from an environmental perspective. *Id*. at 7 (citing Dkt. #28 ("Carroll Decl."), ¶ 3). CNA also points out that Stimson "itself has shown no urgency in the 21 years since it first had site studies performed, and instead has engaged in site investigation only to the extent it would aid in the commercial development of the site." *Id*.

On Reply, Stimson argues that the expenses it has tendered are recoverable both under the duty to defend and the duty to indemnify. Dkt. #30 at 3 (citing, e.g., *Teck Metals, Ltd. v. Certain Underwriters at Lloyd's, London*, 735 F. Supp. 2d 1260, 1267 (E.D. Wash. 2010)). Stimson cites to *Douglass v. Shamrock Paving, Inc.*, 189 Wn.2d 733, 740-41, 406 P.3d 1155 (2017) for the holding that investigative expenses incurred to determine MTCA liability were recoverable. *Id*. at 4.

The Court has reviewed the briefing from both parties and concludes that Stimson has failed to meet its burden of demonstrating that the costs at issue currently fall under CNA's duty to indemnify, or that the fact pattern of this case is sufficiently analogous to that in *Weyerhaeuser* for the holding of that case to apply here. This conclusion is based in part on remaining questions of fact as to whether Stimson is "legally obligated to pay" the expenses at issue, and the nature of the risk posed by the environmental condition of the Property to the surrounding area. The fact pattern of this case differs from *Douglass*, in that Stimson is not paying investigative expenses to clean up a mess caused by Defendant, but is tendering an insurance claim to Defendant for investigative expenses it has undertaken voluntarily in furtherance of plans to develop its property. Given all of the above, the Court will deny Stimson's Motion.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 12

## III. CONCLUSION

Having reviewed the relevant briefing, attached declarations, and the remainder of the record, the Court hereby finds and ORDERS:

1) Plaintiffs' Motion for Summary Judgment (Dkt. #18) is GRANTED. Plaintiffs do not owe Defendant Stimson a duty to defend with respect to the submitted expenses identified above.

2) Defendant Stimson's Motion for Summary Judgment (Dkt. #22) is DENIED. Stimson's counterclaims remain for consideration at trial.

DATED this 14th day of December 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 13